53 A.3d 1

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Bortela PHILISTIN, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 4, 2009.

Decided July 18, 2012.

368

370

R. Nicholas Gimbel, McCarter & English, L.L.P., Robert Jeremy Levant, Levant, Martin & Tauber, P.C., James Joseph McHugh, Jr., Defender Association of Philadelphia, Mark D. Villanueva, McCarter & English, L.L.P., Philadelphia, for Bortela Philistin.

Hugh J. Burns, Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice EAKIN.

Bortela Philistin appeals from the order denying collateral relief from his criminal convictions and death sentence, pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–46. We affirm.

On June 16, 1993, appellant was transporting cocaine while riding in a hack cab, when Philadelphia Police Officers Robert Hayes and John Marynowitz stopped the cab. A scuffle ensued; appellant seized Officer Marynowitz's handgun and shot both officers. Officer Hayes died, and Officer Marynowitz was permanently disabled.[1]

A jury convicted appellant of first degree murder and related offenses. In the penalty phase, the jury found the existence of two aggravating circumstances: the victim was a police officer killed in the performance of his duties, see 42

1. We fully set forth the underlying facts in appellant's direct appeal. *Commonwealth v. Philistin*, 565 Pa. 455, 774 A.2d 741, 742 (2001).

Pa.C.S. § 9711(d)(1); and the defendant knowingly created a grave risk of death to another. *See id.,* § 9711(d)(7). The jury found no mitigating circumstances; thus, it returned a death sentence. *See id.,* § 9711(c). New counsel (appellate counsel) was appointed for appellant's post-trial motions and direct appeal. This Court affirmed on direct appeal. *Philistin,* at 744.

Appellant filed a *pro se* PCRA petition; current counsel began representing appellant and filed an amended PCRA petition. The PCRA court held an evidentiary hearing and denied relief. Appellant appealed to this Court.

Appellant raises the following claims, which we have re-phrased and reordered for ease of discussion: (1) whether the trial court improperly excluded potential jurors who expressed only generalized opposition to the death penalty; (2) whether trial counsel was ineffective for failing to investigate or develop self-defense, imperfect self-defense, or diminished capacity claims, or to request a proper voluntary manslaughter jury instruction; (3) trial counsel should have objected to victim impact evidence; (4) whether trial counsel was ineffective for failing to challenge evidence of appellant's drug dealing; (5) trial counsel should have proven appellant's confession was coerced; (6) whether appellant was improperly denied his rights to testify and represent himself; (7) whether trial counsel was ineffective for failing to object to statements regarding appellant's immigration status; (8) whether trial counsel was ineffective for failing to object to prosecutorial misconduct during the Commonwealth's closing argument; (9) whether trial counsel was ineffective for failing to investigate and present mitigating evidence; (10) whether trial counsel was ineffective for failing to introduce evidence that appellant had no prior felony convictions; (11) whether trial counsel should have advised appellant of his right to testify at the penalty hearing; (12) the PCRA court erred in not compelling trial counsel to explain why he did not submit fee petitions for representing appellant; and (13) the presence of uniformed police during appellant's trial denied him a fair trial.

■ In reviewing a PCRA court's order, we examine whether the PCRA court's determination is supported by the evidence and free of legal error. *Commonwealth v. Lesko*, 609 Pa. 128, 15 A.3d 345, 358 (2011). To be entitled to PCRA relief, appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors or defects found in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, *id.*, § 9543(a)(3), and "the failure to litigate the issue prior to or during trial, . . . or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.*, § 9543(a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue . . . ." *Id.*, § 9544(a)(2). "An issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.*, § 9544(b).

■ Appellant layers his ineffectiveness claims in an attempt to avoid waiver.[2] *See Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 656 (2003) (citing *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1022 (2003)) (when court is faced with "layered" ineffectiveness claim, only viable claim is that related to most recent, appellate counsel). To preserve a "layered" ineffectiveness claim:

[A] petitioner must *"plead*, in his PCRA petition," that appellate counsel was ineffective for failing to raise all prior counsel's ineffectiveness. Additionally, a petitioner must *"present* argument on, i.e. develop each prong of the [*Com-*

2. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), abrogated the rule that claims of trial counsel's ineffectiveness must be raised at the first opportunity where the appellant has new counsel. *Id.*, at 738 (overruling *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977)). Now, a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Id.* Appellant's trial and direct appeal pre-dated *Grant*; therefore, appellant was required to raise his claims of trial counsel's ineffectiveness on direct appeal, as he had new counsel then. Having failed to raise them on direct appeal, he was required to layer them by alleging the ineffectiveness of both trial and appellate counsel in his PCRA petition. *See Hubbard*, at 695 n. 6.

*monwealth v.*] *Pierce* [515 Pa. 153, 527 A.2d 973 (1987)] test" as to appellate counsel's deficient representation.

*Id.* (emphasis in original) (citations and footnote omitted); *see also McGill*, at 1021–23. However, when confronted with a layered claim where the appellate brief insufficiently develops the claim of appellate counsel's ineffectiveness, we have concluded:

> [T]he better practice is not to reject claims of appellate counsel's ineffectiveness on the grounds of inadequate development in the appellate brief if the deficiencies in the brief mirror those in the PCRA pleadings, unless the PCRA court invoked these deficiencies as the basis for its decision and afforded an opportunity to amend. Accordingly, *McGill's* remand procedure will remain an option in cases such as this one, and we will review the underlying claim concerning trial counsel's stewardship to determine whether remand for further development of the claim pertaining to appellate counsel is required.

*Commonwealth v. Walker*, 613 Pa. 601, 36 A.3d 1 (2011).

 "[C]ounsel is presumed effective, and [appellant] bears the burden of proving otherwise." *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 796 (2008) (citing *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 200–01 (1997)). The *Pierce* test requires appellant to prove, with respect to counsel's performance, that: "(1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error." *Lesko*, at 373–74 (citing *Pierce*, at 975).[3] Failure to prove any prong of this test will defeat an ineffectiveness claim. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000). Counsel cannot be deemed ineffective for failing to raise a meritless claim. *Com-*

3. This test is coextensive with the "performance and prejudice" test first enunciated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and recognized in *Pierce*, at 976, as the proper test under the Pennsylvania Constitution.

*monwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 278 (2006). Additionally, we only inquire whether counsel had any reasonable basis for his actions, not if counsel pursued the best available option. *Steele,* at 797.

## I. Jury Selection

■ Appellant argues the trial court improperly removed two potential jurors who expressed only generalized opposition to the death penalty, without determining if they could follow the law and impose the death penalty. Appellant asserts counsel was ineffective in failing to object to the removal of these potential jurors, and direct appellate counsel was ineffective in failing to raise this claim on direct appeal.

The Commonwealth contends these potential jurors indicated their unwillingness to impose the death penalty, and counsel cannot be ineffective for failing to rehabilitate a potential juror. The PCRA court concluded the trial court did not abuse its discretion in excluding these two potential jurors, because they clearly "established an irrevocable commitment to vote against the death penalty." PCRA Court Opinion, 12/1/08, at 25.

■ A potential juror in a capital case may not be excluded merely because of a general moral, personal, or religious reservation about the death penalty. *Steele,* at 803 (citing *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). Nonetheless, "a trial court is within its discretion to exclude jurors who expressed reservations about imposing the death penalty, and ... trial counsel has no constitutional obligation to attempt to change the jurors' views." *Id.,* at 804.

The record supports the PCRA court's finding the trial court did not abuse its discretion in removing these two potential jurors, as both jurors indicated their unwillingness to impose the death penalty. *See* N.T. Jury Selection, 1/25/95, at 78 ("I'm very nervous, I would have some feelings against the death penalty. I don't know whether I could do that."); N.T. Jury Selection, 1/26/95, at 80 ("I'm Catholic and [the death

penalty is] against the Ten Commandments."). Thus, trial counsel was not ineffective for not questioning them further about their ability to follow the law. Accordingly, trial counsel was not ineffective for failing to raise this meritless claim, and appellant's claim regarding appellate counsel likewise fails.

## II. Guilt Phase Claims

### A. Self–Defense, Imperfect Self–Defense, and Diminished Capacity Defenses

Trial counsel, arguing the officers provoked appellant into shooting them, presented a voluntary manslaughter defense at trial. Appellant now argues trial counsel failed to sufficiently research and present alternative guilt phase defenses. Appellant claims trial counsel should have presented the proffered mitigating evidence, detailed in Part III.A, *infra*, to support a diminished capacity defense. He contends trial counsel should have presented self-defense and imperfect self-defense defenses, by showing: appellant did not have a weapon; the officers pulled appellant out of the cab; there was a protracted, violent struggle; appellant shot the gun at the ground; and an officer struck appellant on the head. He claims trial counsel should have requested jury instructions on self-defense and imperfect self-defense. He further contends appellate counsel was ineffective in failing to raise these claims on direct appeal.

The Commonwealth responds that appellant's reliance on his mental health experts is inapposite, as the PCRA court found their testimony was not credible. The Commonwealth alleges appellant cannot show he suffered from diminished capacity, because no mental health experts opined he was unable to form a specific intent to kill. It argues the evidence undermined appellant's self-defense claim, as appellant said he removed Officer's Marynowitz's gun and shot him in the back of the head and back, then fatally shot Officer Hayes, who was lying on the ground with his gun in his holster.

The PCRA court found the evidence did not support a self-defense claim, as appellant provoked the confrontation with the officers, and denied ever aiming the gun at the officers. The court determined appellant's experts did not indicate he

was unable to form a specific intent to kill. The court also reasoned, as trial counsel was never made aware of appellant's mental difficulties, counsel was not ineffective for not consulting a mental health expert.

"[T]he defense of self-defense necessarily requires that the appellant admit that the shooting was intentional in order to protect one's self." *Commonwealth v. Harris*, 542 Pa. 134, 665 A.2d 1172, 1175 (1995) (citing *Commonwealth v. Hobson*, 484 Pa. 250, 398 A.2d 1364, 1368 (1979)). Likewise, an imperfect self-defense claim " 'is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [be satisfied to prove] unreasonable belief voluntary manslaughter.' " *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 947 (2001) (quoting *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 582 (1991)). Thus, to maintain a self-defense or imperfect self-defense claim, appellant must admit he intentionally shot the officers to protect himself. Here, appellant claims he "fired at the ground," Appellant's Brief, at 64, not at the officers. Thus, self-defense or imperfect self-defense defenses are inapplicable, and trial counsel was not ineffective in failing to present them.

As for diminished capacity, we have recently explained:

A defense of diminished capacity ... is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill.... For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill.... Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is

irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense. Furthermore, diagnosis with a personality disorder does not suffice to establish diminished capacity.

*Commonwealth v. Hutchinson,* 611 Pa. 280, 25 A.3d 277, 312 (2011) (citations and footnote omitted). The PCRA court found neither of appellant's experts indicated he was unable to form a specific intent to kill. Appellant notes his experts opined his mental deficiency affected his conduct during the killing; however, the mere inability to control his actions is insufficient to support a diminished capacity defense. Accordingly, as appellant failed to show he lacked the ability to form a specific intent to kill, a diminished capacity defense was inapplicable, and trial counsel was not ineffective for failing to present such defense.

We now address appellant's claim regarding jury instructions. "When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, ... so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 301 (2001). As appellant was not entitled to defenses of self-defense, imperfect self-defense, or diminished capacity, trial counsel cannot be ineffective for not requesting these jury instructions.[4] Likewise, appellant's claims of appellate counsel's ineffectiveness fails.

## B. Victim Impact Evidence

Appellant argues the Commonwealth improperly introduced victim impact evidence in the guilt phase. Appellant complains the Commonwealth introduced evidence regarding Offi-

4. Appellant also claims trial counsel should have objected to the trial court emphasizing in the jury charge that voluntary manslaughter did not apply if there was no provocation. Appellant does not prove the trial court actually emphasized this part of the jury instruction, or that the jury instruction contained any other legal error. He thus cannot argue there was error in the jury charge to which trial counsel should have objected.

cer Hayes' military decorations, and his widow testified about their 15-year marriage and how she and their children kissed him goodbye when he left home the night he died. The Commonwealth also introduced evidence concerning Officer Marynowitz's extensive rehabilitation. Appellant also contends the prosecutor made an emotional appeal in his closing argument, describing the officers as "heroes," "symbols," and "fathers." Appellant insists trial counsel should have objected, and appellate counsel should have raised this claim on direct appeal.[5]

The Commonwealth contends this evidence was properly admitted to rebut appellant's claim at trial that the officers were rogue cops who provoked appellant into shooting them, and the widow's testimony was admissible life-in-being testimony. The Commonwealth asserts its closing argument was appropriate rhetorical flair, and as arguments are not evidence, it could not be improper victim impact evidence.

The PCRA court found the Commonwealth introduced the officer's commendations, military, police, and personnel records, and reputation for professionalism, to rebut appellant's evidence that the officers were rogue officers who provoked the shooting. The court noted trial counsel objected unsuccessfully to this evidence.

The PCRA court properly held this evidence was admissible at appellant's trial. Any evidence evoking sympathy for the victim is inadmissible at trial unless more probative than prejudicial. *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81, 90 (1988).[6] Nonetheless, evidence of a

---

5. Appellant, in a separate section of his brief, claims victim impact evidence introduced in the guilt phase was improperly introduced into the penalty phase. Beyond noting all guilt phase evidence was incorporated into the penalty phase, appellant does not indicate what was introduced during the penalty phase. He provides no authority indicating evidence from the guilt phase cannot be incorporated into the penalty phase. Accordingly, we address all of appellant's victim impact evidence claims here.

6. A statutory amendment, enacted after appellant's trial, makes evidence concerning the victim and the impact that the death of the victim

victim's nature can be properly admitted to explain the victim's actions and support the Commonwealth's theory of the case. *See id.* (allowing evidence of victim's passive nature to explain why victim remained prone during attack). To rebut appellant's suggestion that the victims were rogue officers, the Commonwealth properly presented evidence of Officer Marynowitz's commendations, Officer Hayes' military and police career, personnel records, and both officers' reputation for professionalism.[7] Officer Hayes' widow testified as to the identification her husband's body, including the last time she saw him alive. This information was relevant to prove the victim was a life-in-being the morning of the shooting, and to establish she identified the victim's body. *See Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 237 (2006) (holding mother's testimony as to when she last saw victim alive and her identification of victim's body admissible).[8] Furthermore, the Commonwealth's closing argument was not victim impact evidence, as "the arguments of counsel are not evidence." *Commonwealth v. Ligons,* 565 Pa. 417, 773 A.2d 1231, 1238 (2001). Accordingly, this claim is meritless, and prior counsel were not ineffective in failing to raise it.

## C. Evidence of Drug Dealing

 Police officers, responding to the victims' call for back-up, chased and arrested appellant. They then recovered

has had on the family of the victim now admissible in the penalty phase. 42 Pa.C.S. § 9711(a)(2).

7. Appellant maintains trial counsel never argued that the officers provoked him. This is untrue. Trial counsel, in his opening argument, claimed Officer Marynowitz ran "around the car with the pistol in his hand [saying] 'I'll shoot you. You son of a bitch.' " N.T. Trial, 1/30/95, at 107. He elicited testimony that one of the officers hit appellant with a flashlight, N.T. Trial, 1/31/95, at 45, and elicited evidence about the extent of appellant's injuries. N.T. Trial, 2/6/95, at 45.

8. Appellant, in his reply brief, claims the Commonwealth could have provided life-in-being evidence through other means. However, the Commonwealth has some flexibility in proving its case. *See Old Chief v. United States,* 519 U.S. 172, 186–87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it."). Therefore, trial counsel cannot be ineffective for failing to raise this objection.

a bag containing 48 grams of cocaine approximately 30 feet from where they arrested him. Appellant subsequently admitted he was delivering the cocaine when the murders occurred.

Appellant argues trial counsel should have challenged the Commonwealth's evidence that he was transporting cocaine, as the Commonwealth's drug evidence was crucial to the Commonwealth proving its weak murder case. He further alleges appellate counsel was ineffective in failing to pursue this claim.

The Commonwealth argues, as appellant confessed to being a drug courier, trial counsel reasonably chose to highlight the favorable portions of appellant's confession. The PCRA court found any contradictions in the evidence were minor and would not have resulted in a different outcome, as evidence of appellant's guilt was overwhelming. The court further concluded trial counsel reasonably highlighted the exculpatory portions of appellant's confession, instead of pursuing these minor contradictions.

We find the record supports the PCRA court's conclusion that trial counsel had a reasonable strategy of highlighting the exculpatory portions of appellant's confession. Trial counsel observed, once the motion to suppress the confession was denied, "the only thing then is to try to get as much out of it to help [appellant] as I possibly could." N.T. PCRA Hearing, 11/1/06, at 204. As appellant was found near the drugs, and confessed the drugs were his, he cannot prove trial counsel was unreasonable in failing to argue he never possessed these drugs. Therefore, this claim fails.

### D. Appellant's Confession

 Appellant argues trial counsel should have proven appellant's confession was coerced, by arguing appellant was naked during his interrogation, his injuries required medical attention, and there were inconsistencies in the confession.[9]

9. Specifically, the confession stated appellant received an injury during his arrest, although an arresting officer testified appellant had the injury prior to arrest. Further, although the confession stated appellant

The Commonwealth responds that appellant failed to produce any witnesses regarding the circumstances of his confession. The Commonwealth contends, given the overwhelming evidence of guilt, trial counsel reasonably decided not to argue the confession was coerced and instead focused on its exculpatory portions. The PCRA court noted the trial court denied trial counsel's motion to suppress the confession, as there was no evidence of coercion.

 In deciding whether appellant's confessions were involuntary, we decide " 'not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess.' " *Commonwealth v. Templin*, 568 Pa. 306, 795 A.2d 959, 966 (2002) (quoting *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 882 (1998)). While appellant can show his clothes were confiscated, he does not show he was not provided replacement clothes; thus, he cannot prove he was naked during the interrogation. Further, trivial inconsistencies between the confession and other evidence do not prove the confession was coerced. The record thus supports the PCRA court's finding that the confession was voluntary. Accordingly, trial counsel was not ineffective for failing to raise this meritless claim. Further, as trial counsel was not ineffective, appellant's claim of appellate counsel's ineffectiveness fails.

### E. Appellant's Right to Testify

Before the opening of appellant's case-in-chief in the guilt phase, the trial court sought to colloquy appellant as to whether he wished to testify. Appellant stated, "I wish to testify if another counsel was [representing me]." N.T. Trial, 2/7/95, at 12. Trial counsel requested new counsel be appointed, but the trial court refused to do so. Appellant then waived his right to testify. *See id.*, at 16–18. Appellant claims he wanted to testify, but not while represented by trial counsel, and the trial court erred in forcing him to decide between his

was in contact with a drug dealer named "Georgie" by beeper, there were no persons named "Georgie" found on appellant's beeper.

right to counsel and his right to testify. Appellant further contends trial counsel was ineffective by not requesting a hearing on the nature of the conflict between appellant and himself. He argues appellate counsel should have raised trial court error and trial counsel's ineffectiveness on direct appeal.

The Commonwealth argues the trial court properly refused to appoint new counsel. The Commonwealth notes appellant requested new counsel over a dispute in litigation strategy, after the Commonwealth had completed its case-in-chief, and appointment of new counsel would have caused substantial delay. It insists there is no requirement counsel request a hearing merely because appellant voiced displeasure with counsel. It further contends, as appellant did not testify at the PCRA hearing, there is no evidence as to what testimony appellant would have given at trial.

The PCRA court found this claim was waived because appellant could have previously raised his allegations of trial court error. However, appellant presents a cognizable claim insofar as he insists appellate counsel was ineffective for not raising trial counsel's ineffectiveness on direct appeal. While the PCRA court erred in finding this ineffectiveness claim waived, we need not remand for further proceedings, because we can resolve this claim on the record before us. *See McGill*, at 1026 (finding remand to PCRA court unnecessary where remand would be futile).

Appellant insists the trial court inappropriately forced him to decide between testifying on his own behalf and proceeding without counsel. Appellant was given the chance to testify, but declined, and now complains he would have testified if represented by different counsel. As the right to counsel does not include the right to counsel of one's choice, *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 709 (1998) (citing *Commonwealth v. Johnson*, 428 Pa. 210, 236 A.2d 805 (1968)), appellant does not have the right to testify with appointed counsel of his choice. Otherwise, criminal defendants could obtain new counsel in the middle of trials merely by conditioning the exercise of their right to testify on

the appointment of new counsel. The right to testify guarantees the right of defendants to testify in their own defense, not to have as many new lawyers as they want. Therefore, appellant's claim is meritless, and appellate counsel was not ineffective for failing to raise it on direct appeal.

██ We further determine trial counsel was not ineffective for not requesting a hearing on the conflict between himself and appellant. Trial counsel properly objected to the trial court's decision, and requested a mistrial and appointment of new counsel. The trial court explored appellant's discontent with trial counsel, and appellant fails to show what additional evidence would have been introduced at a hearing. Appellant fails to show trial counsel lacked a reasonable basis for not requesting a hearing; accordingly, his claim regarding appellate counsel also fails.

## F. Appellant's Immigration Status

██ The Commonwealth introduced evidence appellant was an undocumented alien.[10] Appellant, noting the Commonwealth did not argue in its opening and closing arguments that his immigration status was his motive for shooting the officers, claims such evidence was not introduced to show motive, and was therefore irrelevant and prejudicial. He claims trial counsel should have objected to this evidence, and appellate counsel was ineffective in not raising this on direct appeal.

The Commonwealth argues evidence that appellant was an undocumented alien is relevant to his motive, as his desire to avoid deportation may have caused him to fight and shoot the police officers. The PCRA court determined any reference to appellant's immigration status was not prejudicial given the evidence against appellant, and this evidence was properly admitted as evidence of motive.

██ The record supports the PCRA court's finding that evidence of appellant's immigration status was properly admitted at trial. Evidence to prove motive is generally admissible.

10. Appellant entered the United States July 27, 1987, but failed to leave when his visa expired January 26, 1988.

*See Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74, 82 (1987) (quoting *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A.2d 861, 870 (1960)) ("Evidence to prove motive, or intent, or plan, or design, or ill will or malice is always admissible."). Here, appellant's immigration status was relevant to show he had a motive to shoot the officers, lest he be deported. This evidence is admissible as evidence of motive, even if the Commonwealth emphasized other potential motives. Accordingly, trial counsel was not ineffective for failing to raise this meritless claim; therefore, appellant's claim of appellate counsel's ineffectiveness fails.

## G. Prosecutorial Misconduct

Appellant argues trial counsel was ineffective in failing to object to prosecutorial misconduct during the Commonwealth's guilt phase closing argument. Appellant contends the prosecutor sobbed, asked the jury to view the officers as symbols, told the jury to " '[d]o your duty, as these officers were doing,' " N.T. Trial, 2/8/95, at 33, and referred to the officers as heroes and emissaries of God. Appellant claims the prosecutor referred to the officers' families, their personnel records and military service, appellant's immigration status, and said, "I look forward to addressing you again." *Id.*[11] Appellant insists the prosecutor knew these remarks were improper and intended to prejudice the jury. Appellant argues trial counsel should have objected, and direct appellate counsel was ineffective in failing to raise this ineffectiveness claim on direct appeal.

The Commonwealth responds that appellant has isolated sections of the closing argument, without explaining how such arguments are improper. The Commonwealth claims the prosecutor's closing argument was supported by the evidence or was a fair response to comments by defense counsel. The PCRA court found the prosecutor's closing argument did not

11. Appellant also notes the prosecutor said appellant should run because justice is coming. As trial counsel objected to this remark, he was effective in this respect.

deny appellant a fair trial, and his sobbing was a genuine display of emotion.

To prevail on a prosecutorial misconduct claim, appellant must show the prosecutor's actions had the unavoidable effect of undermining the fact-finder's neutrality so as to preclude a true verdict. *Commonwealth v. Kennedy*, 598 Pa. 621, 959 A.2d 916, 923–24 (2008). Further,

> It is well settled a prosecutor may employ oratorical flair in arguing to the jury. Such arguments do not constitute prosecutorial misconduct when the remarks are based upon the evidence or proper inferences deduced therefrom. An improper statement during the prosecutor's closing argument will warrant a new trial only when the unavoidable effect of the statement is to prejudice the jury against the defendant, or prevent it from weighing the evidence objectively and rendering a true verdict.

*Commonwealth v. Patton*, 604 Pa. 307, 985 A.2d 1283, 1287 (2009). The record supports the PCRA court's finding that the prosecutor's closing argument did not deny appellant a fair trial. The references to the officers' families and their personnel and military records was based on the evidence used to rebut appellant's claim that the officers were rogue officers who provoked appellant into shooting them. *See* Part II.B, *supra*. As for the prosecutor sobbing, appellant states "the prosecutor sobbed uncontrollably," Appellant's Brief, at 87, indicating it was a genuine emotional reaction; appellant has failed to prove otherwise. As for the prosecutor referring to the officers as "symbols," and emissaries of God, the prosecutor said:

> Officer Robert Hayes, Officer John Marynowitz, they were symbols, they went through their 20 weeks of training, they came out to protect and to serve. They wear patches on their shoulders that said "honesty, integrity and service." There's an old proverb that said, "God couldn't be everywhere, therefore [H]e made mothers." I would submit to you, carrying it one step further, these two men were there, and they were there to serve, they were our authority.

We pinned badges on them, we gave one the number 6720, we gave the other one the number 6863, go out, protect us, you are part of that thin blue line, you're there to protect us from the dark, you're there to help the weak and curb the strong. Yeah, we gave you a gun, we gave you a badge and we told you we trusted your judgment. You're one of the best.

Now, there are people out there that don't like what you stand for, but you are to ignore that. There are people out there that that will try and get over, you are to stop that. You are to be restrained, because someone is looking over your shoulders, go out there and get the job done.

N.T. Trial, 2/8/95, at 24–25. The prosecutor did not say the officers were emissaries of God; he used an analogy, that as God made mothers to do His work, society creates polices officers to do its work. The prosecutor utilized appropriate rhetorical flair, describing the officers as heroes and symbols, in response to appellant's argument that they provoked him into shooting. Likewise, the prosecutor's statement that he hoped to talk to the jury again was not improper; it is logical for a prosecutor, during his closing argument, to ask the jury to convict appellant.

 Appellant also complains the prosecutor told the jury, "Do your duty, as these officers were doing. Do your duty, as the court will implore you." *Id.*, at 33. The prosecutor once again argued the officers were doing their duty, refuting appellant's claim they were rogue officers. Further, it was not harmful to appellant, as the prosecutor asked the jury to follow the trial court's instructions.

 Appellant has also failed to show the Commonwealth's closing argument prevented the jury from rendering a true verdict. The trial court cautioned the jury that the arguments of counsel were not evidence, and the jury must base its verdict solely on the evidence. *Id.*, at 39–40. We presume the jury followed these instructions. *See Commonwealth v. Miller*, 572 Pa. 623, 819 A.2d 504, 513 (2002) ("[T]e law presumes that the jury will follow the instructions of the

court."). Thus, this claim is meritless, and trial counsel was not ineffective for not further objecting to the closing argument. As trial counsel was not ineffective, this claim of appellate counsel's ineffectiveness fails.

## III. Penalty Phase Claims

### A. Investigation and Presentation of Mitigating Evidence

At the PCRA hearing, appellant presented multiple witnesses in an attempt to show trial counsel failed to adequately investigate and present mitigating evidence.[12] Ghislaine Francois, appellant's mother, testified appellant was born in her childhood home, a small house lacking running water or electricity, shared with five other people in a poor neighborhood of Port–au–Prince, Haiti. Appellant's father was uninvolved in his life. Francois indicated appellant suffered a high fever and diarrhea when he was three and a half years old, causing him to suffer a seizure and climb on a wall. Francois testified she and her mother disciplined appellant by whipping him. *See* N.T. PCRA Hearing, 7/24/06, at 39–56.

Francois noted dictator François "Papa Doc" Duvalier ruled Haiti while she was growing up. When appellant was born, Jean Claude "Baby Doc" Duvalier, Papa Doc's son, was dictator. The Tonton Macoute, an organization working for Duvalier that abused and tortured people, had its offices near her house. She also lived a few doors from the Caserne Dessalines.[13] Francois indicated she told appellant to avoid police and not to do things that would cause the police to harm him. She said appellant was fearful of the police, and he witnessed a shooting during a carnival festival. *See id.,* at 57–67. Francois and appellant moved to a new three-room house in 1984 or 1985, which also lacked running water and electricity, and was in "not that good" of a neighborhood. *Id.,* at 68–69. Haiti descended into chaos after Jean Claude Duvalier was overthrown; thus, when appellant was 14 years old, Francois

12. Appellant did not testify at the PCRA hearing.

13. The Haitian government detained and interrogated people suspected of anti-governmental activity at the Caserne Dessalines.

sent him to spend the summer with her sister in Philadelphia, where he remained. *See id.,* at 74–80.

Francois testified that when she learned appellant had been arrested, she travelled to Philadelphia, and she and two friends met with trial counsel. She claims trial counsel did not ask anything about appellant's life in Haiti, his conditions growing up, his medical history, his behavior, or injuries he may have had, nor did he discuss an investigation, and he did not tell her she could testify at trial. She stated she was never told the trial was going on, but her brother-in-law asked her to send money to help an investigation, and she sent $600. *See id.,* at 85–91.

Francois noted a mother and grandmother who loved appellant raised him, and other people in the household cared for and helped him. Francois admitted physical discipline was common in Haiti. She noted police did not mistreat her and her sister, appellant did not witness the violent incidents she testified to, he got good grades, and regularly went to church. She took appellant on trips to Puerto Rico, Philadelphia, and Miami. She admitted, after appellant was arrested, she left her brother-in-law in charge of matters relating to appellant's case. *See id.,* at 93–107.

Yonelle Madhere, who lived with appellant from when he was three to 14 years old, testified he had memory problems, did not play with other children, and was a peaceful person. Madhere observed Francois physically discipline appellant, despite her protests. Madhere claimed no one contacted her about appellant's trial or asked her to testify. She testified the last time she saw appellant was in 1987, appellant regularly attended school and church, and it was dangerous for him to play with other children. *See id.,* at 116–22.

Esther Dufreene, appellant's neighbor from 1983 until 1985, noted the Caserne Dessalines was "a place that you come to know if you check in, you don't check out." *Id.,* at 125. She saw police beatings in front of the Caserne Dessalines, but she did not know if appellant saw any of this, and she was never detained or beaten by the police. She indicated Francois used

to whip appellant, and appellant was afraid of his mother. Nonetheless, he had a gentle personality and was interested in schooling. Dufreene was never contacted by trial counsel. *See id.,* at 125–28.

Phito Estimable, who lived with appellant in Haiti, indicated the neighborhood's condition was poor. He noted the house lacked electricity and plumbing, and often leaked when it rained. They lacked money, and normally ate cornmeal or rice. He noted they lived across the street from the Caserne Dessalines and near the Tonton Macoute offices, and the Tonton Macoute had a bad reputation and tortured whomever they detained. Appellant was also afraid of police, but Estimable did not know if appellant witnessed police abuse. Estimable stated appellant was a good, respectful, and non-violent person, but he tended to be forgetful and had difficulty sleeping. Estimable indicated no one asked him to testify at appellant's trial. *See id.,* at 132–44. Estimable acknowledged, although he also grew up under Haiti's violent dictatorship, he had never had a problem with the law and now lives in New York City.

Lisa Haqq met appellant in 1988 after he moved to Philadelphia. She indicated he was active in church activities, and he became treasurer of the church's youth council. She said appellant was dedicated, pleasant, and had a reputation as a peaceful, honest, law-abiding person. Haqq claimed she went to the courtroom, but left because a police officer told her the trial was over. *See* N.T. PCRA Hearing, 7/25/06, at 40–51. She admitted she did not know appellant had been expelled from high school, and did not know when he last attended church. Haqq acknowledged her mother attended appellant's trial. *See id.,* at 53–61.

At some time prior to his arrest, appellant was employed at Einstein Medical Center. Nona Rhodes, appellant's supervisor, testified he was helpful, energetic, outgoing, eager to learn, hardworking, and had a reputation as being honest, truthful, and law-abiding. However, she did not socialize with him outside of work. *See id.,* at 65–71, 73.

Appellant's step-cousin lived with appellant and her parents, appellant's aunt and uncle, from 1989 until 1991. She testified appellant was withdrawn but had a reputation as a good, easy-going, and friendly young man. She did not know him to act violently. She attended the same high school as appellant, and he had good grades, was employed, had friends, was a member of the church youth council, and played sports. She had little contact with appellant after 1991. She and her parents met with trial counsel before the preliminary hearing, but she had no other contact with trial counsel. *See id.*, at 89–98, 100–03.

Appellant's uncle, Alvin Carty, indicated appellant lived with him from 1988 until his arrest. Appellant had his own room, did chores, attended church, and had a job. Appellant enrolled at Temple University, but stopped attending for financial reasons. Although Carty never saw appellant with sizeable quantities of cash, appellant received telephone calls and once had a car from his "country people." *See* N.T. PCRA Hearing, 7/26/06, at 52–63. Carty testified that in 1989, with appellant present, police forcibly entered his house and choked him. After appellant's arrest, Carty, his wife, daughter, and five or six friends of the family from New York met trial counsel. Carty said he never met nor spoke with an investigator, and trial counsel indicated the City did not pay him for an investigation. Carty testified Francois provided $600 for an investigation, which he forwarded to trial counsel. *See id.*, at 65–86.

Carty admitted people looking for drugs knocked on his door at all hours, as the people living next-door dealt drugs, and he had filed multiple lawsuits against the City of Philadelphia. He provided a good and loving home to appellant, where appellant was treated like a son. Appellant regularly attended school, got good grades, and never needed mental treatment. Appellant was expelled from high school, and after attending a remedial disciplinary school, was allowed to enroll in and graduate from another high school. Carty did not know appellant left college because of poor grades, or that appellant was unemployed at the time of his arrest. Despite

Carty's testimony that appellant lived with him at the time of the arrest, appellant told prison officials he was living with a girlfriend in New Jersey. Carty also did not recall telling a television reporter that appellant was living with a girlfriend in New Jersey at the time of the murder. *See id.*, at 96–129.

Karim Shabazz, trial counsel's investigator, testified he served subpoenas and did a sketch of the crime scene. He did not speak to appellant, investigate the case's facts, or investigate appellant's medical, educational, employment, family, or social history. He also did not interview anyone for the case. *See* N.T. PCRA Hearing, 7/25/06, at 14–22. Ronald Miller, a licensed private investigator whose signature appears on invoices submitted by trial counsel, indicated he did not work at the agency named on the invoices, did not prepare the invoice, and did not sign the invoices. *See* N.T. PCRA Hearing, 11/1/06, at 8–26.

Appellant offered the testimony of Georges Fouron, Ph.D., a professor of social sciences and education for the State University of New York at Stony Brook, who researches transnational migration from Haiti. Dr. Fouron explained François "Papa Doc" Duvalier became president in 1957, and subsequently became President for Life. His son, Jean Claude "Baby Doc" Duvalier, became President for Life in 1971. Under the Duvaliers, the police were part of the Army, sharing the same uniforms, facilities, and command structure. The Tonton Macoute were civilian volunteers who reported to the President, performed domestic security and law enforcement functions, carried firearms, counterbalanced the Army, and spied on civilians. Dr. Fouron indicated the Haitians were afraid of the Haitian security forces, as they used abusive methods, including arbitrary arrests, abductions, beatings, choking, torture, and public executions. Dr. Fouron acknowledged he never met appellant, and had no personal knowledge of appellant's experiences. N.T. PCRA Hearing, 5/31/06, at 85–87, 93–95, 107, 116, 128.[14]

14. We conclude the PCRA court properly held Dr. Fouron's testimony was irrelevant, as Dr. Fouron knew nothing about the murder or appellant's life experiences. *See Commonwealth v. Harris,* 572 Pa. 489,

Appellant presented the expert testimony of Julie Kessel, M.D., a forensic psychiatrist who performed a psychiatric examination and clinical interview of appellant. Dr. Kessel also reviewed our opinion on direct appeal, appellant's affidavit, affidavits from numerous people, and the reports of appellant's other experts. She diagnosed appellant with chronic post-traumatic stress disorder (PTSD). She also diagnosed appellant with cognitive disorder, not otherwise specified (NOS), also known as brain damage. She believed appellant's brain damage could have been caused by his childhood illness and lack of basic utilities while he was growing up. She also considered appellant's physical discipline excessive. She noted when appellant was 12 years old, police arrested everyone at a rally he was near, and while he was not harmed, he was afraid he would be killed. Thus, Dr. Kessel believed appellant's exposure to Haitian governmental violence lead him to develop a fear of being captured and harmed by police. He also feared for his family, had nightmares, became anxious and worried, and believed people were following him. These symptoms were reawakened after police entered his uncle's house in 1989. She also stated appellant's good grades and ability to hold a job were not inconsistent with PTSD, as PTSD can wax and wane over time, and appellant currently manifests intermittent nightmares, feelings that someone is holding him down, is easily startled, and is afraid of the night. N.T. PCRA Hearing, 3/6/06, at 80–83. Appellant also has a sense of impending doom, fear of governmental authorities and people in uniform, avoids talking about his background, spaces out, and loses memory. *See id.*, at 83–87.

Dr. Kessel opined appellant's PTSD and cognitive disorder affected his behavior during the murder, as the incident caused an acute aggravation of his PTSD, and the cognitive disorder made him more likely to misinterpret cues and impaired his reaction. She opined PTSD alone, or in combination with cognitive disorder, constituted a severe emotional

817 A.2d 1033, 1054 (2002) (finding testimony with "no bearing on appellant's character or record or the circumstances of the offense" irrelevant). Trial counsel cannot be ineffective for not presenting this inadmissible evidence.

and mental disorder, extreme emotional disturbance, and resulted in appellant's inability to conform his conduct to the requirements of the law.[15] *See id.,* at 53–56, 106.

Dr. Kessel admitted her diagnosis depended on the candor of appellant's latest account of the murder. Dr. Kessel acknowledged she did not read any of the testimony from appellant's trial, the affidavits of his aunt or uncle, or his school records. She admitted the trial testimony did not corroborate appellant's account, and did not consider it relevant that appellant was robbed at gunpoint a month before the murder. Further, appellant never reported any abuse by Haitian authorities. *See id.,* at 117–92.

Appellant also presented Johnathan Mack, Psy.D., a psychologist specializing in clinical psychology, clinical neuropsychology, and forensic psychology, who conducted a neuropsychological evaluation of appellant. This included interviewing appellant, performing neuropsychological tests on him, and reviewing his social, medical, educational, and vocational history. Dr. Mack diagnosed appellant with cognitive disorder NOS, coordination disorder, and PTSD. At the PCRA hearing, he made numerous corrections to his report and insisted these errors did not alter his conclusions. On the Folstein Mini–Mental State Exam, used to test for orientation and alertness, appellant's functioning was low average. On the Beck Inventories, which measure depression, anxiety, and optimism/pessimism, appellant's anxiety score was normal, and he scored in the minimal range for depression and in the mild range for pessimism. The Wechsler Adult Intelligence Scale, Third Edition, showed appellant had a full-scale intelligence quotient of 95, and mild impairment in working memory and processing speed. Appellant showed moderate impairment on the BDAE Complex Ideational Material Subtest of the Boston Naming

15. Mitigating circumstances include "[t]he defendant was under the influence of extreme mental or emotional disturbance[,]" 42 Pa.C.S. § 9711(e)(2), "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired[,]" *id.,* § 9711(e)(3), and "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." *Id.,* § 9711(e)(8).

Test, indicating he had difficulty in retrieving words from his vocabulary. The Neuropsychological Deficit Scale showed left cerebral brain damage, as well as some evidence of right cerebral brain damage. *See* N.T. PCRA Hearing, 3/30/06, at 25–102. Dr. Mack opined appellant's childhood discipline and illness, and an incident in kindergarten where appellant fell and hit his head, could have caused his brain damage. Further, Dr. Mack stated appellant's nightmares, inability to sleep, hyperreactivity, and fear of going outside supported the PTSD diagnosis. He concluded appellant was under the influence of an extreme mental or emotional disturbance at the time of the murder. *See id.*, at 119–20.

Dr. Mack conceded he only discovered the errors in his report after appellant's PCRA counsel asked him to review it, and he reviewed documents that he did not list in his report as having reviewed. He further noted none of his tests provided objective indicia of PTSD. Dr. Mack admitted it was hard to say appellant's brain damage alone could substantially impair his ability to conform his conduct to the law, and appellant's college enrollment was inconsistent with brain damage. *See id.*, at 128–75. He further noted he used English language tests, although English was not appellant's first language. N.T. PCRA Hearing, 3/30/06, at 54.

At the PCRA hearing, trial counsel stated he did not hire a mitigation specialist, mental health expert, or forensic social worker. He did not attempt to interview anyone who knew appellant from Haiti, nor did he investigate appellant's living conditions in Haiti. N.T. PCRA Hearing, 11/1/06, at 51–52. He asked Carty to contact Francois, but believes Carty was unsuccessful. He also had a fellow attorney unsuccessfully attempt to contact Francois. For the penalty phase, trial counsel did not subpoena appellant's family members, co-workers, fellow church members, or his prison or school records.[16] Trial counsel explained he talked with Carty at the end of each day, and Carty came to be dissatisfied with his

16. Appellant provided evidence that he had a good disciplinary record while incarcerated awaiting trial. *See* N.T. PCRA Hearing, 7/25/06, at 7.

representation. Trial counsel noted this was a high profile and sensitive case, and appellant or any of his relatives may have been discredited if they testified in the penalty phase that appellant was not guilty. Trial counsel testified he met with appellant on multiple occasions, but noted appellant did not like him. He indicated he usually used Shabazz to find witnesses and verify their police statements, but could not recall what he assigned Shabazz to do in this case. *See* N.T. PCRA Hearing, 11/1/06, at 82–84.

Trial counsel noted he did not call two co-workers as potential character witnesses because they did not want to get involved. Trial counsel, who had successfully tried multiple capital cases, was never informed, nor did he suspect, appellant was suffering from any brain damage, PTSD, or other mental health or anxiety problem. Appellant did not tell trial counsel about any agitation, nightmares, fear of police, or witnessing police brutality. Trial counsel determined appellant's church attendance was not helpful "with the facts ... coming out in front of this jury." *Id.*, at 270.

Appellate counsel, who filed appellant's post-trial motions and represented him on direct appeal, claimed he never received the case file from trial counsel. He states he never hired any investigator or experts, and largely limited his research to record-based claims. He did not know to what extent trial counsel investigated mitigation evidence, appellant's prison conduct, or appellant's lack of a prior criminal record. *See* N.T. PCRA Hearing, 11/3/06, at 37–39. As appellant was articulate and active in his case, appellate counsel said he had no reason to believe appellant was brain damaged or suffering from a mental illness. *See id.*, at 75–78.

The Commonwealth presented John O'Brien, II, M.D., J.D., a forensic psychiatrist, who evaluated appellant and reviewed Dr. Kessel's and Dr. Fouron's reports, Dr. Mack's uncorrected report, court documents, and affidavits of appellant's friends and family. Dr. O'Brien also reviewed appellant's correctional and educational records, a website about appellant, and Dr. Gordon's report, and was present while Dr. Kessel testified. Dr. O'Brien testified appellant did not satisfy the diagnostic

criterion of PTSD. He opined appellant's mild cognitive limitations did not warrant a psychiatric diagnosis, were not a severe or extreme mental or emotional disturbance, and did not limit appellant's functioning during the murder. He noted appellant lacked any prior psychiatric history or symptoms. He criticized Dr. Mack for relying on language-based testing, as some of appellant's limitations may be attributable to his limited English ability. *See* N.T. PCRA Hearing, 4/3/06, at 3–83.

The Commonwealth also presented John E. Gordon, Ph.D., a neuropsychologist who did not evaluate appellant but reviewed multiple documents. Dr. Gordon opined appellant's mild brain damage did not impair appellant's ability to conform his conduct to the requirements of the law or his ability to appreciate the consequences of his acts. Dr. Gordon noted testing largely showed appellant was not impaired, and stories of past head injuries were insufficient to show brain damage absent actual proof of such damage. Dr. Gordon observed the few tests to show impairment were language-based tests, and these results could be attributable to the fact that English was not appellant's first language. *See* N.T. PCRA Hearing, 5/25/06, at 78–122.

Appellant argues trial counsel was ineffective for failing to adequately investigate and prepare potential mitigating evidence. Appellant highlights trial counsel's failure to secure his mother's presence at trial, insisting he should have told her it was important for her to testify. He claims trial counsel could have produced evidence of his upbringing in Haiti, his life in Philadelphia, and the police entry into his uncle's home. He further contends he suffers from PTSD, which affected him during the murder. Appellant faults trial counsel for not obtaining mental health experts to testify as to his PTSD, cognitive disorder, and fearfulness of police. He also insists trial counsel should have obtained his incarceration records. Appellant argues he was prejudiced because if this evidence was presented, at least one juror would have voted against the death penalty. He claims appellate counsel was ineffective in failing to raise this claim on direct appeal. In his reply brief,

appellant argues trial counsel should have independently investigated his background for mitigation evidence.

The Commonwealth alleges trial counsel met with appellant and his family, none of whom indicated appellant suffered from mental or cognitive difficulties or had a troubled childhood. The Commonwealth claims, because the school system and Department of Corrections also did not detect appellant's deficiencies, any deficiencies appellant had were so subtle it was reasonable for counsel not to detect them as well. The Commonwealth also notes the PCRA court found appellant did not suffer from PTSD and cognitive disorder.

The Commonwealth insists counsel made reasonable efforts to secure Francois's presence at trial, urging Carty to contact her and attempting to call her. The Commonwealth reasons trial counsel cannot be ineffective for not calling the witnesses appellant did not tell him about, and trial counsel attempted to procure the witnesses appellant did tell him about. It contends appellant failed to show his upbringing in Haiti was particularly troubled, as he went with his mother on trips and moved to Philadelphia, where he lived a well-adjusted life. It thus insists this mitigation evidence would not have altered appellant's case.

The PCRA court found, because no one advised trial counsel of appellant's condition and there was no "smoking gun" which required trial counsel to further explore appellant's mental condition, trial counsel reasonably did not investigate appellant's mental difficulties. It found appellant's evidence of his PTSD and cognitive disorder were not credible, as appellant had completed high school, enrolled in college and had no history of any mental condition. The court also rejected Dr. Mack's testimony, and credited Dr. O'Brien's testimony that appellant was not suffering from PTSD during the shooting.[17]

17. Appellant argues the PCRA "court improperly invaded the province of the trial jury in determining the credibility and reliability of witnesses in a PCRA proceeding." Appellant's Brief, at 27. In his reply brief, he claims as the PCRA court cannot find their testimony incredible, his experts' testimony created a reasonable probability that one juror would spare his life. See Commonwealth v. Johnson, 600 Pa. 329,

The PCRA court further held trial counsel was not ineffective in not presenting additional witnesses in mitigation. The court concluded trial counsel informed Francois of the importance of attending trial, but she did not attend, and trial counsel had reason for not calling Carty as a penalty phase witness because he was an aggressive witness. The PCRA court determined trial counsel did not know of the existence of other witnesses. The court found appellant failed to show he was prejudiced by the absence of these witnesses, especially as many of them did not have contact with him for years before the murder.

Appellant relies on *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), which held capital counsel must thoroughly investigate and prepare mental health and other mitigating evidence, *Williams*, at 396, 120 S.Ct. 1495; counsel cannot merely rely on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources," *Wiggins*, at 524, 123 S.Ct. 2527 and counsel must investigate "even when a capital defendant's

966 A.2d 523, 540–41 (2009) (PCRA court's credibility findings guided by *Strickland's* prejudice standard).

"[T]he appellant may file a brief in reply to matters raised by appellee's brief . . . and not previously addressed in appellant's brief." Pa.R.A.P. 2113(a). Here, appellant already addressed this issue in his initial brief but failed to make this specific argument; thus, insofar as appellant raised this argument only in his reply brief, it is waived.

Appellant's contention is also frivolous on its merits. It is well settled that PCRA courts make credibility determinations. *See, e.g., Commonwealth v. Dennis*, 609 Pa. 442, 17 A.3d 297, 305 (2011) (citations omitted) ("A PCRA courts credibility findings are to be accorded great deference where the record supports the PCRA courts credibility determinations, such determinations are binding on a reviewing court."); *Johnson*, at 539 (A PCRA Court passes on witness credibility at PCRA hearings, and its credibility determinations should be provided great deference by reviewing courts.). Appellants claim would render PCRA hearings superfluous, as a PCRA claimant would be entitled to relief upon proffering affidavits showing a reasonable probability the outcome of his proceeding would be different. This is not the law. Additionally, to prevail pursuant to *Strickland*, appellant must prove counsels strategic decisions were unreasonable. Because a jury does not decide whether counsels performance was unreasonable, a PCRA court does not invade the jury's province in making these decisions.

family members and the defendant himself have suggested that no mitigating evidence is available." *Rompilla*, at 377, 125 S.Ct. 2456. In *Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294 (2008), we noted:

> Under prevailing constitutional norms . . . capital counsel has an obligation to pursue all reasonable avenues for developing mitigating evidence. Counsel must conduct a thorough pre-trial investigation, or make reasonable decisions rendering particular investigations unnecessary. Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, courts are to make all reasonable efforts to avoid distorting effects of hindsight. Nevertheless, courts must also avoid "*post hoc* rationalization of counsel's conduct."

*Id.*, at 303–04 (citations and footnote omitted). However, *Williams, Wiggins,* and *Rompilla*

> did not establish a new federal constitutional standard by which to measure counsel's stewardship in preparing for the penalty phase; they simply applied *Strickland's* well-settled ineffectiveness standard to later cases involving the specific question of counsel's duty to investigate mitigating evidence in a capital case. This standard is a general one, and must be flexible enough to consider the prevailing professional norms at the time of counsel's performance.

*Commonwealth v. Birdsong*, 611 Pa. 203, 24 A.3d 319, 347 (2011) (citing *Strickland*, at 689, 104 S.Ct. 2052).

The United States Supreme Court has reminded us that "[s]urmounting *Strickland's* high bar is never an easy task. . . . [T]he standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (citations omitted). We respect "the wide latitude counsel must have in making tactical decisions." *Cullen v. Pinholster*, —— U.S. ——, 131 S.Ct. 1388, 1406, 179 L.Ed.2d 557 (2011) (quoting *Strickland*, at 689, 104 S.Ct. 2052). In the *Strickland* analy-

sis, we decide only if "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, at 788 (quoting *Strickland*, at 690, 104 S.Ct. 2052). Thus, specific guidelines are not appropriate, as the same investigation will not be required in every case. *Cullen*, at 1406–07.

 We begin by addressing whether trial counsel was ineffective for failing to investigate and present evidence concerning appellant's mental and cognitive difficulties. We find the record supports the trial court's crediting Dr. O'Brien's testimony that appellant did not suffer from PTSD during the murder.[18] While appellant argues Dr. O'Brien's testimony must be rejected because his findings were largely consistent with those of Drs. Kessel and Mack, as all the experts reviewed the same person, there should be some consistencies in their findings. Appellant also faults Dr. O'Brien for not examining him thoroughly.[19]

18. Appellant claims the PCRA court's decisions failed to explain the reasoning behind its credibility determinations. However, as the PCRA court has provided sufficient justification here for its credibility findings, this contention fails.

19. Appellant opposed Dr. O'Brien's examination, and insisted Dr. Kessel observe Dr. O'Brien's examination. The PCRA court indulged this request, and Dr. O'Brien's examination of appellant was conducted in Dr. Kessel's presence and transcribed by a court reporter. *See* N.T. PCRA Hearing, 9/6/05, at 10–12. Appellant cannot complain about the limited nature of Dr. O'Brien's examination when he sought to limit it. *See Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916, 930 (2005) (finding defendant who raised diminished capacity defense, and then resisted evaluation by Commonwealth's expert, "cannot profit by his recalcitrance"). Furthermore, Dr. O'Brien is an experienced psychiatrist who indicated this was a proper clinical examination. *See* N.T. PCRA Hearing, 4/3/06, at 22–23. Dr. O'Brien also reviewed the reports of appellant's experts and affidavits submitted by appellant. Thus, appellant cannot prove Dr. O'Brien's evaluation was inadequate.

As further guidance to PCRA courts, we note PCRA claimants are not entitled to have their experts observe evaluations by the Commonwealth's experts. *See Commonwealth v. Banks*, 596 Pa. 297, 943 A.2d 230, 238 (2007) (*per curiam* ) (holding counsel not entitled to be present when Commonwealth's expert evaluated defendant for competency hearing).

The record also corroborates Dr. O'Brien's testimony. Appellant presents no evidence he was ever treated for a mental condition prior to his arrest. The evaluator who examined appellant shortly after his arrest noticed no impairments, and appellant presented no symptoms while incarcerated and awaiting trial. Indeed, appellant was well-adjusted while living in Philadelphia, did well in school, enrolled in college, and participated in church. Despite his claims that he was marred by the conditions in Haiti, appellant could only show he witnessed a single incident of police abuse in Haiti. Thus, the record supports the PCRA court's finding that Dr. O'Brien's testimony was credible.[20]

The record further supports the PCRA court's rejection of Dr. Mack's testimony that appellant suffered cognitive impairments. Dr. Mack's need to correct multiple errors in his neuropsychological testing undermined confidence in his results. Further, both Dr. O'Brien and Dr. Gordon stated appellant's performance may have been hampered on Dr. Mack's language-based tests because English was not appellant's first language. The record thus supports the PCRA court's conclusion that appellant failed to prove he suffered from PTSD or cognitive disorder. Accordingly, appellant cannot prove counsel was unreasonable in not presenting evidence of conditions appellant did not establish actually existed.

We now consider whether trial counsel had a reasonable basis for not investigating and presenting evidence of appellant's background. The evidence at the PCRA hearing showed counsel met with Carty, appellant's aunt and cousin, and attempted to have several of his co-workers testify as character witnesses on his behalf. When these co-workers declined to testify, counsel acted reasonably in not forcing them to testify, lest they refuse to provide useful character testimony. As Carty was uncooperative, the record supports

20. For these same reasons, the record supports the PCRA court's rejection of Dr. Kessel's conclusions that appellant suffers from PTSD and cognitive disorder, NOS.

the PCRA court's determination that trial counsel was reasonable in not calling him as a penalty phase witness.

The record also supports the PCRA court's finding trial counsel took reasonable measures attempting to locate Francois. Appellant essentially argues trial counsel should have told Francois that she could testify. Counsel relied on appellant's aunt and uncle, Francois's sister and brother-in-law, to keep Francois informed; this was reasonable as Francois herself indicated she left Carty in charge of overseeing appellant's defense.

▮ Furthermore, appellant cannot show he was prejudiced by the absence of this evidence. To show prejudice, appellant must prove:

> [T]here is a reasonable probability that, absent counsel's failure to present the mitigation evidence he currently proffers, [appellant] would have been able to prove at least one [more] mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s).

*Lesko,* at 383 (quoting *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1150–51 (2005)).

All the witnesses from Haiti, except Francois, had no contact with appellant since he left Haiti half a decade before the murder, and even Francois visited appellant only twice after he moved to Philadelphia. Thus, their testimony, while relevant to appellant's background, would have been of limited utility because they knew nothing of appellant in the half-decade before the murder. Further, Francois, Madhere, Dufreene, Estimable, and the step-cousin, although they endured similarly poor conditions and saw as much or more violence than appellant, lead law-abiding and functional lives, and none of them indicated they suffered any mental health conditions. Similarly, Haqq, appellant's step-cousin, his aunt, uncle, and coworkers testified appellant was peaceful, lawful, hardworking, and academically successful. Because this evidence undermined appellant's contention that his Haitian upbringing

psychologically scarred him, appellant cannot show this evidence would have helped him.

 While Drs. Kessel and Mack may have offered their opinion as to appellant's mental condition, they could not, as discussed *supra*, credibly show appellant suffered from PTSD or cognitive disorder. Thus, given appellant's decent adjustment, and lack of noticeable psychological symptoms, appellant's mental health testimony would not have helped him. Likewise, appellant's pre-trial incarceration record[21] would have harmed his case. His good behavior in prison betrayed no fear or poor reactions to prison officials, although they were uniformed governmental authorities, nor any mental or cognitive difficulties. Thus, the incarceration record would be inconsistent with appellant's claim of being afraid of governmental authorities and suffering mental and cognitive difficulties.

Here, appellant murdered one police officer and grievously injured a second while he was transporting cocaine. Given the strength of this aggravating evidence, and the weakness of the mitigating evidence, it is unlikely any juror would have found the existence of one or more mitigating circumstances and determined they outweighed these aggravators. Therefore, appellant cannot prove he was prejudiced by trial counsel's failure to investigate and present this mitigating evidence. As trial counsel was not ineffective, appellant's claim of appellate counsel's ineffectiveness likewise fails.

## B. Appellant's Lack of Prior Criminal Convictions

 Appellant argues trial counsel should have introduced, as mitigating evidence, his lack of a history of prior criminal

---

**21.** The PCRA court held the pre-trial incarceration record was irrelevant because the Commonwealth did not offer evidence of appellant's future dangerousness. This is legal error, as a capital defendant's pre-trial incarceration record can be mitigating evidence, regardless of whether his future dangerousness is put in issue. *See Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (concluding capital defendant may introduce pre-trial incarceration record as mitigating evidence).

convictions.[22] He further claims appellate counsel was ineffective in not raising this claim on direct appeal.

The Commonwealth alleges, because it was undisputed appellant had no prior criminal record, counsel is not ineffective for not presenting evidence of an uncontested fact. The Commonwealth further claims, as appellant was convicted of assaulting Officer Marynowitz and drug possession, he had prior felony convictions at sentencing. The PCRA court rejected this claim, as there was a concession appellant had no prior record of criminal convictions.

■■ Under Pennsylvania law, when a capital defendant is convicted of offenses in conjunction with first degree murder, the Commonwealth may use those convictions to rebut the § 9711(e)(1) mitigating circumstance. *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 461 (2006) (citing *Commonwealth v. Wharton,* 542 Pa. 83, 665 A.2d 458, 461 (1995)). Thus, had trial counsel presented evidence of appellant's lack of criminal record, the Commonwealth could have noted appellant had just been convicted for drug possession and assault.[23] Accordingly, there was an objectively reasonable strategy for not presenting this evidence, trial counsel was not ineffective. As trial counsel was not ineffective, appellant's claim of appellate counsel's ineffectiveness also fails.

## C. Appellant's Right to Testify at the Penalty Hearing

■ Noting there is no record that trial counsel informed him of his right to testify at the penalty phase, appellant complains counsel was ineffective for not advising

**22.** It is a mitigating circumstance if "[t]he defendant has no significant history of prior criminal convictions." 42 Pa.C.S. 9711(e)(1).

**23.** Appellant argues this was not counsel's actual strategy. However, in assessing ineffectiveness claims, instead of limiting ourselves to those strategies counsel says he pursued, we determine whether there was any objectively reasonable basis for counsel's conduct. *See Harrington,* at 790 (citing *Strickland,* at 688, 104 S.Ct. 2052) ("*Strickland,* however, calls for an inquiry into the objective reasonableness of counsels performance, not counsels subjective state of mind.").

him of this right. He further contends appellate counsel was ineffective for not raising this claim on direct appeal.[24]

The Commonwealth argues appellant fails to prove trial counsel never advised him of his right to testify at the penalty phase. The Commonwealth notes trial counsel's practice was to consult with his clients about whether they should testify in the penalty phase, and appellant did not introduce any evidence trial counsel failed to advise him of this right. The PCRA court, addressing this as a claim of trial court error, found this claim was waived as appellant failed to raise it on direct appeal.

Because counsel is presumed effective, appellant must prove he is entitled to relief. Appellant does not offer evidence trial counsel did not advise him of his right to testify at his penalty phase. Therefore, this claim fails.

## IV. Other Claims

### A. Trial Counsel's Failure to Submit a Fee Petition

During the PCRA hearing, trial counsel testified he served as appointed counsel in three or four[25] capital cases, including here, where he did not submit fee petitions, "for personal reasons," "to the tune of $30,000." N.T. PCRA Hearing, 11/1/06, at 191. Appellant asked the PCRA court to require trial counsel to explain why he did not submit fee petitions. Appellant proffered trial counsel agreed to represent multiple capital defendants to pay off $30,000 in back wage taxes he owed to the City of Philadelphia. He suggested this agreement was a conflict of interest and created an appearance of impropriety. The PCRA court found this was irrelevant, and

24. Appellant also alleges this error is *per se* prejudicial because his right of allocution is sacrosanct. *See Commonwealth v. Thomas,* 520 Pa. 206, 553 A.2d 918, 919 (1989) (remanding for resentencing because defendant was not informed of right to allocution). This argument fails, as there is no right to allocution in capital penalty phases. *See Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 857 (1989) (right to allocution abrogated in capital cases).

25. It is not clear from the record how many cases there were where trial counsel did not submit fee petitions. Trial counsel said alternatively "three," N.T. PCRA Hearing, 11/1/06, at 191, and "three other" cases. *Id.,* at 192.

declined to order trial counsel to explain his reason for not filing fee petitions.

 Appellant now argues the PCRA court erred in not forcing trial counsel to explain why he did not file a fee petition. Appellant suggests trial counsel bargained for a forgiveness of tax debt in exchange for representing him and two or three other capital clients, and this arrangement created a conflict of interest, as trial counsel was working to pay off his tax debt to the City of Philadelphia. Appellant claims trial counsel had an incentive to minimize the amount of work he performed to that necessary to settle his debt. Thus, appellant requests a remand to explore the nature, extent, and form of any compensation trial counsel received.

The Commonwealth contends the PCRA court properly limited appellant's inquiry, because appellant cannot show the existence of an actual conflict of interest. The Commonwealth claims trial counsel would have been paid by the City of Philadelphia regardless, and trial counsel is presumed to place his duty to his client above his own pecuniary interests.

Appellant, in his reply brief, clarifies he merely seeks remand for further evidentiary findings. Appellant alleges that there is a vast difference, at least to him, between submitting fee petitions and working off a tax debt to the City.

 " '[A]n evidentiary hearing ... is not ... a fishing expedition for any possible evidence that may support some speculative claim of ineffectiveness.' " *Commonwealth v. Wharton*, 571 Pa. 85, 811 A.2d 978, 989 n. 12 (2002) (quoting *Commonwealth v. Scott*, 561 Pa. 617, 752 A.2d 871, 877 n. 8 (2000)). Besides the fact trial counsel did not submit a fee petition, appellant has not provided any evidence, such as tax records, to support his proffered reason why trial counsel did not submit a fee petition. He further speculates that this evidence could bolster his ineffectiveness claims, but does not identify any claim that would benefit from exploring trial counsel's reasons for not submitting a fee petition. Indeed, we have already addressed appellant's ineffectiveness claims, and whatever subjective reason counsel had for not submitting

a fee petition is not pertinent to determining if trial counsel's strategy was objectively reasonable.

 We now consider whether appellant's proffer can support a conflict of interest claim. When a defendant fails to object at trial, he " 'cannot prevail on a conflict of interest claim absent a showing of actual prejudice.' " *Commonwealth v. Small,* 602 Pa. 425, 980 A.2d 549, 563 (2009) (quoting *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1231 (2006)). Prejudice will be presumed when counsel is burdened by an actual conflict of interest. *Id.* An actual conflict of interest exists when counsel actively represented conflicting interests and the defendant "shows counsel's conflict of interest actually affected the adequacy of [counsel's] representation[.]" *Id.* (citing *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). For the purposes of this analysis, we assume appellant's proffer is true, and that trial counsel did not submit a fee petition because he had agreed to represent capital defendants to work off a tax debt owed to the City of Philadelphia. Instead of submitting a fee petition and receiving a check, trial counsel received forgiveness of a debt. Forgiveness of debt is considered income,[26] just as much as payment by check, cash, or direct deposit. Appellant insists these two forms of income are distinct, at least to him. However, he cites no authority and does not explain how this method of payment is impermissible. While appellant suggests trial counsel would minimize the work he performed on appellant's case, "courts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client." *United States v. Taylor,* 139 F.3d 924, 932 (D.C.Cir.1998) (citing *United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir.1997)). Appellant does not explore how counsel's performance would have been different if counsel had submitted a fee petition, or how any of appellant's ineffectiveness claims are bolstered by the manner in which trial counsel was compensated. Indeed, as

26. *See* I.R.S. Publication 4681, at 2 (Apr. 20, 2011) ("Generally, if a debt for which you are personally liable is cancelled or forgiven, ... you must include the canceled amount in your income.").

appellant's current counsel are representing him *pro bono*, he should be well aware attorneys are capable of advocating for him without expecting pecuniary compensation. Therefore, appellant cannot prove trial counsel was burdened by a conflict of interest merely because of his allegedly unorthodox compensation arrangement.[27] Accordingly, appellant has failed to show the PCRA court should have compelled trial counsel to disclose why he did not file a fee petition.

## B. Presence of Police Officers in Courtroom

Appellant's jury trial was attended by uniformed police officers. When the jury returned its verdict convicting appellant, a number of these officers cheered in approval. Trial counsel asked the court to empanel a new jury for the penalty phase. The court declined to seat a new jury, and instead gave a curative instruction. On direct appeal, we held the outburst did not prejudice appellant; however, we did not address the claim pertaining to the officers' presence itself, as it was not couched as such. *See Philistin*, at 743–44.

Appellant contends trial counsel was ineffective for not objecting to the police presence and layers his claim by arguing appellate counsel was ineffective for not arguing the police presence itself was prejudicial. The Commonwealth responds that police officers, like other members of the public, had a right to attend appellant's trial. The Commonwealth argues appellant failed to show the police presence was inherently prejudicial, as he produced no evidence of the number of police officers, when they were there, or how they behaved. The PCRA court found this claim was waived because appellant failed to raise this claim at trial or on direct appeal.

The United States Supreme Court has cautioned that "[w]e do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." *Holbrook v. Flynn*, 475 U.S. 560, 570–71, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). In *Holbrook*, four

27. We do not opine on the appropriateness of an attorney agreeing to represent a client, without the client's knowledge or consent, in exchange for a third party agreeing to forgive the attorney's debts.

uniformed police officers sat in the first row of a courtroom to provide security. Flynn subsequently challenged the police presence as inherently prejudicial. The Court held "[w]henever a courtroom arrangement is challenged as inherently prejudicial ... the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.*, at 570, 106 S.Ct. 1340 (quoting *Estelle v. Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). The Court concluded Flynn was unable to show he was denied a fair trial. *Id.*, at 572, 106 S.Ct. 1340. The Court further found there was sufficient cause for this police presence because there was a state interest in maintaining courtroom security, offsetting any minor prejudice Flynn may have suffered. *Id.*

We addressed *Holbrook* in *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110 (2008), where Gibson was convicted of first degree murder and sentenced to death at a trial where police officers were present. Gibson argued the police presence violated *Holbrook*, and counsel was ineffective for not objecting to this police presence. In rejecting this argument, we held "where the record does not indicate the number of uniformed officers present or any disturbance caused thereby, we conclude ... [Gibson] cannot demonstrate that an unacceptable risk of the jury considering impermissible factors was created." *Gibson*, at 1139 (citations omitted).[28] Because it is undisputed the police spectators here caused a disturbance during appellant's trial, *Gibson* does not necessarily preclude appellant from proving the police presence created an unacceptable risk of the jury considering impermissible factors.

**28.** Notably, the officers in *Holbrook* were present at the request of the trial court to provide security. The United States Supreme Court has held it is still an open question as to whether spectator conduct can be inherently prejudicial. *Carey v. Musladin*, 549 U.S. 70, 76, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). However, we have previously applied *Holbrook* and its inherent prejudice standard to police presence during trial. *See Gibson*, at 1138. As no party here argues *Holbrook* is not the proper standard, we apply it here.

**412** 

█ Regarding the guilt phase, appellant cannot demonstrate that, but for trial counsel's failure to object to the mere presence of the uniformed officers, the verdict would have differed. *See Strickland,* at 694, 104 S.Ct. 2052 The officers' outburst did not occur until after the verdict was rendered, so it could not have affected the verdict. Thus, to be entitled to relief, appellant must demonstrate the officers' presence so influenced the guilt phase proceedings that he was denied a fair trial. As previously noted, the PCRA court found this claim waived; however, even if given the opportunity to establish prejudice resulting from the uniformed officers at the guilt phase, appellant would not be able to do so. The overwhelming evidence against him showed he shot two police officers in the head at close range with a handgun. Appellant cannot prove that, had counsel objected to the officers' presence, or had they not been present, the jury would have acquitted him, despite the evidence against him.[29]

█ Regarding the penalty phase, appellant's argument in his brief is sparse and undeveloped; he simply states, "In this case, the police crossed the line from interested spectators to advocates for a particular outcome. Appellant was deprived of a fair trial and a reliable capital sentencing because of the inherently prejudicial atmosphere in which he was tried." Appellant's Brief, at 93–94. Aside from referencing the officers' presence as creating an "inherently prejudicial atmosphere," appellant does not attempt to explain how this presence infected the penalty phase. In his PCRA petition, appellant claimed the uniformed officers with weapons gave the jury the impression he was extremely dangerous,[30] "thereby injecting improper factors into the weighing at capital sentencing." PCRA Petition, 1/7/05, at 178. However, appellant overlooks the fact that the Commonwealth did not

29. This is not to say that a defendant can never be prejudiced by the conduct of uniformed officers in the courtroom; we simply find under the circumstances in appellant's trial, prejudice could not have resulted.

30. Appellant argues this in the same breath that he argues the officers were not there for security reasons, but rather to "send a message." *See* PCRA Petition, 1/7/05, at 178.

argue appellant's dangerousness at the penalty phase, and the jury was only directed to weigh the § 9711(d)(1) and (7) aggravators [31] and the § 9711(e)(1) and (4) mitigators; [32] there is nothing indicating the jury considered an impermissible factor in the weighing process. Furthermore, the trial court explicitly and emphatically instructed the jury, following the officers' outburst, that it was *not* to let their conduct influence the penalty phase deliberations in any way:

> [A]s you return to begin the final phase of this trial, that is the penalty phase, I not only implore you, but I direct you not to consider that unfortunate, unexpected and inexcusable outburst in any way as you deliberate on the penalty.
>
> * * *
>
> You are not to be influenced or intimidated in any way by the totally outrageous behavior of some spectators yesterday.

N.T. Sentencing, 2/10/95, at 13–14. As the jury is presumed to follow the trial court's instructions, *see Commonwealth v. Travaglia,* 611 Pa. 481, 28 A.3d 868, 882 (2011) (citation omitted), appellant cannot demonstrate the officers' presence and outburst tainted the penalty phase. Accordingly, appellant's ineffectiveness claims regarding both trial and appellate counsel fail.

Order affirmed; jurisdiction relinquished. [33]

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices BAER, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a dissenting opinion.

**31.** 42 Pa.C.S. § 9711(d)(1) (victim was law enforcement officer killed in performance of duties); *id.,* § 9711(d)(7) (in commission of offense, defendant knowingly committed grave risk of death to another person).

**32.** *Id.,* § 9711(e)(1) (defendant had no significant history of prior criminal convictions); *id.,* § 9711(e)(4) (defendant's age at time of offense).

**33.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

Justice SAYLOR, dissenting.

I would award a new trial based upon trial counsel's patently deficient stewardship in failing to seek redress concerning the atmosphere in which Appellant's trial was conducted. I also have substantial concerns with the PCRA court's refusal to entertain evidence about trial counsel's compensation arrangement with the City of Philadelphia. My reasoning follows.

As the majority observes, Appellant's trial for the killing and maiming of police officers was attended by numerous uniformed policemen. After the jury found Appellant guilty on all charges, a number of these officers cheered to show their approval. The circumstances were described contemporaneously by trial counsel as follows: "[T]he police officers, in particular, who were en masse in the courtroom in full regalia, rais[ed] their fists and rais[ed] their thumbs to the jury—to the jurors[.]" N.T., Feb. 10, 1995, at 4. The trial judge responded to the incident as follows: "Wait a minute, this is a courtroom, this is not a stadium. Now, I don't care if you're a policeman or the President of the United States, keep your mouth shut." N.T., Feb. 9, 1995, at 5–6.

Trial counsel urged the court to empanel a new jury for the penalty phase. *See id.* at 6–7. The prosecutor took a different view, suggesting that "a great deal of the confusion was added to by the wailing and screaming of, I believe, the defendant's girlfriend and another civilian connected with the defendant." N.T., Feb. 10, 1995, at 7. The trial court responded to the prosecutor:

> I think the outburst was more in the volume and quality and quantity as [trial counsel] described than it is in what you've described.... It's the worst I have ever seen. I could have never dreamed as such.

*Id.* at 9–10.[1] Nevertheless, the court indicated "I'm going with the route of giving a curative instruction," and "if, after

---

1. Counsel's description, as credited by the trial court, was also consistent with a media account of the incident. *See* Kurt Heine, *Philistin Guilty of Killing Cop and Maiming a 2nd Officer: Judge is Outraged by*

all of that, [the jurors] come back with the penalty of death, there's no doubt about it that [the defense] has a very good issue for appeal." *Id.* at 10; *see also id.* at 11 ("Let us try this method first and if they come back with the death penalty, [trial counsel], you have an excellent appellate issue."). The trial court then instructed the jurors:

[W]hen you delivered your verdict yesterday morning, an outburst occurred among some spectators. That outburst was disruptive and outrageous, it was unexpected and spontaneous and never should have occurred.

... [A]s you return to begin the final phase of this trial, that is the penalty phase, I not only implore you, but I direct you not to consider that unfortunate, unexpected and inexcusable outburst in any way as you deliberate on the penalty.

... You will receive instructions on the law which you are to follow during your deliberations on the penalty. You must follow the law.

You are not to be influenced or intimidated in any way by the totally outrageous behavior of some spectators yesterday.

N.T., Feb. 10, 1995, at 13–14.

In the penalty proceedings, the jury returned a verdict of death based on the presence of aggravation and the finding of no mitigation. *See* 42 Pa.C.S. § 9711(c).

The court appointed new counsel for direct appeal, who raised two issues, the first of which concerned an "overt outburst[ ] of approval" on the rendition of the guilt-phase verdict. In the appellate brief, the issue was framed solely as

*Cheering Police*, Phila. Daily News, Feb. 10, 1995, at L5 ("From the standing-room-only crowd in the rear, dozens of men wearing gunbelts and police uniforms whooped and pumped fists in the air like Flyer fans cheering a fight on the ice."). The presence of many uniformed officers in the courtroom throughout the trial proceedings is also reflected in the testimony of witnesses presented at the post-conviction stage. *See, e.g.*, N.T., Nov. 1, 2006, at 32 (testimony of trial counsel that the courtroom was "packed" with uniformed officers); N.T., July 25, 2006, at 20 (testimony of Karim Shabazz that the courtroom was "loaded" with uniformed police officers); N.T., July 26, 2006, at 87 (testimony of Alvin Carthy that "[t]he place was packed" with officers).

one involving the trial court's discretion, with no constitutional claims being asserted. Brief for Appellant in *Commonwealth v. Philistin*, 565 Pa. 455, 774 A.2d 741 (2001) (No. 252 CAP), 2000 WL 34016571, at *7. Counsel did not assert any claim deriving from the presence of uniformed officers "en masse" in the courtroom in the first instance. Furthermore, in the discussion of the "outburst" claim counsel did raise, other than by way of quotation of the trial judge's initial admonishment ("I don't care if you're a policeman or President of the United States"), counsel failed to mention that uniformed law enforcement officers were involved. *See id.* at *7–9. Finally, counsel asserted, incorrectly, that the trial court failed to respond with a cautionary instruction. *See id.* at *7.

Consistent with Appellant's brief, this Court described the incident generically as a "spectator outburst," and resolved the claim without acknowledging officer involvement, other than by way of quotation to the trial judge's initial admonishment. *Commonwealth v. Philistin*, 565 Pa. 455, 460–61, 774 A.2d 741, 743–44 (2001), *cert. denied*, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002). The Court explained:

> Given the facts that the outburst occurred only once, that it was promptly brought under control by the trial court, and that a thorough curative instruction was given to the jury before the proceedings continued, we are satisfied that any potential prejudice was abated.

*Id.* at 461, 774 A.2d at 744.

Appellant pursued post-conviction relief, challenging, *inter alia*, trial counsel's stewardship in his failure to object to an assertedly "overwhelming and intimidating police presence" throughout trial, as well as appellate counsel's stewardship in failing to raise the matter in this Court. For the first time, Appellant invoked his constitutional right to a fair trial under the Sixth Amendment to the United States Constitution, applicable to the States via the Fourteenth Amendment. According to Appellant's amended post-conviction petition, the environment in which he was tried undermined the jurors' impartiality, thus thwarting a verdict and sentence grounded on the evidence and the law alone.

At the ensuing hearing, the Commonwealth repeatedly objected to Appellant's attempts to develop evidence concerning the courtroom atmosphere at the time of trial, arguing that the matter was previously litigated on direct appeal, despite the limited focus of the argument presented at that time. The PCRA court sustained various of these objections. *See, e.g.,* N.T., Nov. 1, 2006, at 35 (reflecting the post-conviction judge's comment that "[p]eople cheering or not cheering in a courtroom is not part of the case").

Subsequently, the post-conviction court dismissed Appellant's petition. In its supporting opinion, the court did not address the underlying and derivative claims centered on police presence, but rather, summarily couched them as "waived." [2]

Presently, Appellant acknowledges that law enforcement officers are free to attend public court proceedings. Nevertheless, he asserts that when, as in this case, they are present in uniform and en masse, a fair trial is not possible. According to Appellant, the trial court failed to perform its duty to guard against the "atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process."

---

[2]. The PCRA court does not appear to have required Appellant to submit a statement of matters complained of on appeal; rather, it relied on Appellant's appellate jurisdictional statement in discussing the issues. In the jurisdictional statement, Appellant advanced claims concerning police presence and the courtroom outburst, but he did not attach derivative claims of deficient stewardship on the part of his trial and appellate counsel. However, Appellant had presented such claims to the post-conviction court in his amended PCRA petition, as well as in his post-hearing memorandum. Thus, the court was on notice of the derivative aspects.

In terms of this Court's own review, the Commonwealth does not argue that the absence of layering in the jurisdictional statement constitutes a waiver. Moreover, layered claims are presented by Appellant in his present brief pertaining to this issue. This Court has not generally acted *sua sponte* to screen the jurisdictional statements in capital post-conviction appeals for potential waiver issues based on the absence of layering, and I would not do so now. *Cf. PPL Generation, LLC v. DEP,* 604 Pa. 326, 344 n. 11, 986 A.2d 48, 59 n. 11 (2009) ("The waiver forwarded [on account of an assertedly deficient jurisdictional statement], even if deemed plausible, is not one involving a lapse impeding effective appellate review. Thus, we will reach the merits.").

*Estes v. Texas,* 381 U.S. 532, 561, 85 S.Ct. 1628, 1642, 14 L.Ed.2d 543 (1965).

It is Appellant's position that the matter goes to the core of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978) ("[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on the grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."). Appellant observes that the United States Supreme Court has recognized that the overwhelming police presence in a courtroom constitutes an impermissible factor, as follows: "We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." *Holbrook v. Flynn,* 475 U.S. 560, 570–71, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986). Appellant places particular emphasis on a decision of a federal appeals court awarding relief after a murder conviction for the killing of a prison guard, in part, based on the presence at trial of a substantial number of uniformed prison guards. *See Woods v. Dugger,* 923 F.2d 1454 (11th Cir.1991). As to the trial court's decision to proceed with the penalty phase subject to appellate-stage review of an "excellent" issue, Appellant describes the approach as nothing better than a "judicial roll of the dice" to avoid confronting the egregious violation of his trial rights. Brief for Appellant at 95.

Appellant further challenges his trial attorney's stewardship, since counsel did not object to the pervasive police presence from the outset of the trial proceedings. Appellant also claims that his counsel on direct appeal rendered deficient stewardship by failing to raise the broader claim of the police presence from the start of the trial (as opposed to concentrating the assertion of a generic "outburst of approval"). According to Appellant, due to the deficient stewardship, this Court was never adequately apprised of the continuous presence of large numbers of uniformed police officers throughout

the trial and of the intimidating atmosphere which this creat-
ed. Had this Court been so informed, Appellant claims, it is
reasonably likely that relief would have been awarded.

The Commonwealth, for its part, takes the position that the
main focus of Appellant's argument is on the outburst. In this
regard, it highlights trial counsel's responsive actions, includ-
ing his motion for a mistrial; the trial court's curative instruc-
tion; and this Court's emphasis on the curative measures in
the direct appeal. Further, the Commonwealth asserts that
trial counsel had no basis for objecting earlier to the heavy
police presence, since the victims' fellow officers, like other
members of society, had the right to attend the trial proceed-
ings. The Commonwealth observes that, whenever a defen-
dant challenges a courtroom arrangement as inherently preju-
dicial, he must demonstrate that " 'an unacceptable risk is
presented of impermissible factors coming into play.' " *Hol-
brook*, 475 U.S. at 570, 106 S.Ct. at 1346–47 (quoting *Estelle v.
Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d
126 (1976)). Appellant, in the Commonwealth's view, has
made no such showing here.

Initially, the Commonwealth's repeated assertions of a fail-
ure of proof at the post-conviction hearings cannot be charged
to Appellant, when—as noted—the PCRA court repeatedly
refused to permit him to develop a full record. Moreover, I
believe there is enough here to support a considered judgment
both on the pivotal, underlying issue regarding the risk of
impermissible factors affecting the jurors' decision-making, as
well as on derivative questions.

The circumstances presented here are deeply troubling.
This was an emotionally-charged trial as reflected, not the
least, by the prosecutor openly sobbing during his closing
remarks, *see* N.T., Feb. 8, 1995, at 27, as well as the unseemly
conduct in the gallery on the rendition of a verdict of guilt.
Additionally, throughout his closing, the prosecutor repeatedly
referred to police officers as "symbols." *See, e.g., id.* at 26 ("I
submit to you, ladies and gentlemen, [Appellant] did not kill a
man, he killed a symbol."); *id.* at 31 ("These symbols that you
see before you . . ."); *id.* ("Officer Marynowitz and Officer

Hayes, symbols of law, symbols of order ..."). Particularly in light of the prosecutor's theme, the jurors could not have helped but to appreciate the symbolism reflected by presence of dozens of uniformed officers in the courtroom awaiting their verdict.

In such circumstances, I agree with those courts which have explained,

> Where a substantial number of uniformed or otherwise identifiably garbed officers are not present for the purpose of preserving order in the courtroom or to provide testimony in the proceedings, a jury is susceptible to the impression that the officers are there "to communicate a message to the jury."

*Shootes v. State*, 20 So.3d 434, 439 (Fla.Dist.Ct.App.2009) (quoting *Woods*, 923 F.2d at 1459).

As Appellant develops, the right to a fair trial is a fundamental one and subsumes the entitlement to have guilt or innocence decided solely based on the evidence admitted in trial proceedings and not based on other circumstances. *See Holbrook*, 475 U.S. at 567, 106 S.Ct. at 1345 (citing *Taylor*, 436 U.S. at 485, 98 S.Ct. at 1934); *see also Shootes*, 20 So.3d at 438 ("[T]he Fourteenth Amendment incorporates the essence of the Sixth Amendment right to be tried by a panel of impartial, indifferent jurors whose verdict must be based upon the evidence developed at the trial."). Furthermore, I agree with those courts which recognize and enforce their " 'obligation to protect jurors from any possibility of influence or intimidation by the appearance of a [uniformly outfitted] sea of spectators.' " *Id.* (quoting *United States v. Yahweh*, 779 F.Supp. 1342, 1344 (S.D.Fla.1992)).

The post-conviction testimony, as well as contemporaneous observations credited by the trial court, confirm that uniformed, armed law enforcement officers were present in large numbers in the courtroom at critical stages of Appellant's trial. Even without the outburst, it is not possible to hypothesize a reason why trial counsel would not have asked the court to implement some measure or measures to address the

impact of such a demonstration, at the very least by requiring some portion of the officers to appear in civilian clothing. The decisions of the United States Supreme Court referenced by Appellant plainly supported a request for court intervention, and trial counsel's failure to do so facilitated the ensuing, intolerable public display, which has no place in a courtroom. In particular, and as Appellant highlights, the United States Supreme Court has warned of "the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." *Holbrook*, 475 U.S. at 570–71, 106 S.Ct. at 1347.

The Commonwealth is correct that the specific matter of the outburst was previously (albeit very poorly) litigated on direct appeal.[3] Nevertheless, it is plain enough that the incident is one of several reflections of the overly charged atmosphere in the courtroom, which should have been redressed much earlier in the trial proceedings to ensure fairness.[4] Direct-appeal counsel failed to pursue such claim, although he too should have been armed with the pertinent federal constitutional decisions, and, again, there simply is no excuse for a failure in this regard.

In these circumstances, it is clear that Appellant's claim of deficient stewardship on the part of his counsel on direct appeal has merit; counsel had no reasonable strategy for

3. For my own part, I concede to having been remiss in my own review of the record at the direct appeal stage. Had I appreciated the full details, I would have favored the award of a new penalty hearing on the limited issue that was preserved and/or in connection with the mandatory review for passion, prejudice, or other arbitrary factors. *See* 42 Pa.C.S. § 9711(h)(3).

4. Parenthetically, I disapprove of the trial court's "wait-and-see" approach to redress, including its deferral of review of Appellant's "excellent" issue to the appellate courts. Our trial courts are charged, in the first instance, with the full and fair judicial resolution of controversies with which they are presented. Indeed, the deference our appellate courts afford to the trial courts reflects those courts' closer proximity to the facts and circumstances at hand upon making their essential rulings. This record, unfortunately, suggests an abdication on the part of the trial court of its responsibility to make such a necessary, timely decision in an emotionally-charged, high-profile case.

failing adequately to preserve and present the meritorious, underlying claim; and there is prejudice in light of the unacceptable risk that impermissible factors came into play at Appellant's trial.

For the above reasons, I would reverse the order of the PCRA court and remand for vacation of Appellant's conviction and sentence and the award of a new trial.

Finally, at the post-conviction hearings, Appellant sought to question trial counsel concerning his compensation arrangement with the City of Philadelphia. The PCRA court, however, sustained various Commonwealth objections based on relevancy, *see* N.T., Nov. 14, 2006, at 7, so that the nature of the arrangement is not established as of record.

In his appellate brief, Appellant seeks a remand to explore the fee arrangement. Appellant alleges that counsel undertook the representation, as well that of three other capital defendants, in exchange for the discharge of $30,000 in deficient tax liabilities owing to the City. *See* Brief for Appellant at 97–100. According to Appellant, such an arrangement evidences a conflict of interest and is relevant to counsel's stewardship. The record does contain some evidence that is consistent with Appellant's allegation of a work-off agreement.

For my part, at least, I find the arrangement suggested by the present record to be unseemly, and thus, I believe there should be a full record concerning its nature in order for Appellant's salient claim to be addressed on the merits.